46452. INMAN v. THE STATE.

ARGUED JUNE 30, 1971—DECIDED JULY 8, 1971.

*Nightingale, Liles & Dennard, Thomas E. Dennard, Jr., B. N. Nightingale,* for appellant.

*W. Glenn Thomas, Jr.,* District Attorney, *Wesley A. Wraggs,* for appellee.

HALL, Presiding Judge. 1. The State contends that the oral declarations of a judge are not binding; that as no judgment ordering probation was ever signed, the defendant never commenced serving such a sentence; that the matter of sentence was still within the breast of the court; and therefore, the written judgment and sentence of one year's incarceration must be affirmed.

While it is true that an oral sentence is not a binding judgment of the court, the law is also clear that once a person has entered upon the execution of his sentence, the court is without power to change it by increasing the punishment. This is considered a violation of the Fifth Amendment prohibition against double punishment or jeopardy. United States v. Benz, 282 U. S. 304 (51 SC 113, 75 LE 354); *Gobels v. Hays,* 194 Ga. 297 (21 SE2d 624); *Rutland v. State,* 14 Ga. App. 746 (82 SE 293). See also 168 ALR 706.

We do not believe the question of whether defendant's punishment was increased merits discussion. The State does not argue the point. The real issue is whether defendant had begun serving his sentence. To take the technical view that nothing had happened yet, because the judge had not signed a document, is to ignore the realities of court practice and administration. Every lawyer knows that judges do not sit at the bench drawing complex orders or judgments. In a civil action, the prudent attorney comes armed with suitable writings to present if he prevails. In a criminal action, the State has forms which only require the insertion of the date, defendant's name, the charge and the number of years he gets. The transcript here reveals that in this type of case, the formal judgment of conviction, sentence and probation is prepared by the probation office and submitted to the judge at some later time for signature. Without knowing what the backlog of paperwork this particular office has, we can assuredly say that it does not have the power to delay the running of a sentence because of clerical problems, when all other necessary steps in the process have been completed.

Defendant had gone with a probation officer, at the *court's direction,* immediately following the oral sentence. He was in-

structed in the rules of probation and signed all the required papers. He paid his fine. He was released as, and because he was, a probationer, expecting and expected to follow the rules. He did not break the haircut condition, he pursued a legal process to have it changed. If the probation office had neglected to draft a judgment for two years, then by any standard of due process, defendant would have been entitled to discharge.

Accordingly, the court was without power to resentence him, and the subsequent judgment and sentence is utterly void.

2. There remains the sentence of two years probation—with a short haircut. Defendant vigorously attacks the condition as a violation of the First, Eighth and Fourteenth Amendments, at the very least. We not only agree, but take judicial notice that the rotunda of the State Judicial Building contains busts of three of our most eminent and hirsute Justices, featuring the magnificent, shoulder-length locks of our beloved Chief Justice Joseph Henry Lumpkin. As Judge Wyzanski of the District Court of Massachusetts said so well: "Today many of both the younger and the older generations have avoided the increased cost of barbering by allowing their locks or burnsides to grow to greater lengths than when a haircut cost a quarter of a dollar. Whether hair styles be regarded as evidence of conformity or of individuality, they are one of the most visible examples of personality. This is what every woman has always known. And so have many men, without the aid of an anthropologist, behavioral scientist, psychiatrist, or practitioner of any of the fine or black arts." Richards v. Thurston, 304 FSupp. 449, 451.

We recognize that a person occupies a special status while on probation, during which time his private life and behavior may be regulated by the State to an extent that would be completely untenable under ordinary circumstances. The rationale for this power is basically, of course, that the person has been convicted of a crime and would be serving a sentence but for the grace of the court. He is a prima facie risk to society. It will, however, allow him the opportunity to prove himself otherwise. Nevertheless, once having shown weakness, he may not place himself in a position to be easily tempted again. Such conditions of probation as avoiding "undesirable people," abstaining from alcohol or drugs,

and even holding a steady job, fall into the "no temptation" category. Others, such as violating no penal laws, are self-evident. Requirements for reporting to a probation officer and remaining in the jurisdiction are basically devices for checking on the efficacy of the probation.

The conditions listed so far would probably be endorsed by a significant segment of society as reasonable controls on a risk, i.e. they are believed to directly affect the probationer's (or parolee's) tendency to either further anti-social behavior or rehabilitation. While such terms as "undesirable people" and "general good behavior" border on the fuzzy and would be open to differing interpretations, they still pertain to *social behavior*—in which society, acting through its courts, has a legitimate interest.

Unfortunately, we have no enunciated standards in case law for testing conditions of probation. The closest we have come is the statement: "Service of a sentence on probation is conferred as a privilege . . . and cannot be demanded as a matter of right. This does not mean, however, that a defendant's liberty is something that can be the subject matter of whim or fancy of the trial judge." *Cross v. Huff,* 208 Ga. 392, 396 (67 SE2d 124). However, the American Bar Association has published a tentative draft of "Standards Relating to Probation," Institute of Judicial Administration (1970). Section 3.2 (b) reads: "Conditions imposed by the court should be designed to assist the probationer in leading a law-abiding life. They should be reasonably related to his rehabilitation and not unduly restrictive of his liberty or incompatible with his freedom of religion." The drafter's commentary observes that this means "conditions must achieve a balance between oppression and necessity, between interference and utility." Id. p. 48.

The condition at issue here represents no more than a particular judge's taste in personal appearance and one which has no demonstrable effect on behavior. Society has not authorized its courts to make such conditions for probationers. Some other judge could well decide that they ought to wear striped uniforms and have shaven heads. Limited as their freedom undoubtedly is, probationers are still individuals, not inmates. Having been deemed worthy to stay in society, they must either have the right of a

free man to a personal self-expression which does not infringe on the rights of others, or the whole concept of rehabilitation through probation goes down the drain. See "Standards," supra, § 1.2. Outside becomes prison. While few young men would choose to serve a sentence rather than cut their hair, even fewer would finish with a sense of respect for criminal justice. A condition of probation which invades a person's constitutionally protected right to personal self-expression and which is not related directly to his rehabilitation, cannot meet the test of reasonableness.

We therefore reverse the judgment and remand to the trial court with direction that it enter as its judgment, nunc pro tunc, the original sentence of two years to be served on probation subject to the payment of a $500 fine, but with the condition of a haircut deleted.

*Judgment reversed with direction. Eberhardt and Whitman, JJ., concur.*